We rise to the third case of the morning, Fall 2009, 10-6-0. This is the State of Illinois v. Juana Rivera. On behalf of Mr. Rivera, Mr. Lawrence C. Marshall, formerly of Northwestern University, now president of the Stanford Law School, and on behalf of the State, Mr. Jay Hawkins. Mr. Marshall. Good morning, your honors. May it please the court. When this court last considered this case a decade ago, even before the explosive DNA results of 2005, the court characterized the evidence as, quote, closely balanced, end quote. Now, in view of the dramatic developments with the DNA testing which I'll discuss, the evidence is no longer closely balanced. The evidence weighs heavily in favor of a finding, a compelled finding, of absence of reasonable doubt and entitlement to acquittal. And the evidence most certainly weighs heavily in favor of granting a new trial based on the myriad errors that occurred below. Counsel, your client asked for a jury trial, had a jury trial, had several as a matter of fact, and this particular jury found him guilty. What do we do with the precedent about any reasonable, rational trial or fact? So, your honor, in looking at sufficiency of the evidence after a jury trial, it's critical for an appellate court, we've been told, to walk a fine line. On the one hand, there has to be deference to the trier of facts, reasonable resolutions, and reasonable inferences about whether the evidence constitutes proof beyond a reasonable doubt. But just as fundamentally, courts have been told by the U.S. Supreme Court and by the Illinois Supreme Court and by this court, that appellate review of sufficiency of the evidence is not a rubber stamp on the ground that a jury has ruled. That juries, even reasonable ones, as the court says in Cunningham, as the court says in People v. Smith, can at times be blinded by the fact pattern of a case. And the standard that Smith sets forth, the standard that I'd like to discuss, is that when the claim of guilt that the prosecution puts forward requires dependence on unreasonable, improbable, or unsatisfactory kinds of theories and speculations, then it is the sober duty of this court to reverse, notwithstanding the jury verdict. And I submit that's precisely what happened here. The DNA results tell us that the evidence on the swab stick, and critically on the vial in which the original swab had been housed and had gone untouched for 15 years, or 13 years at that point, that that evidence excludes Juan Rivera. Now, unless the state has some evidence that is reasonable and probable and satisfactory to deflect the message of that DNA, we are in a position where a court, I would submit, has to say that the persistent doubts about Juan Rivera's guilt are not unreasonable. Then it is not reasonable for a jury to say that those doubts can be dismissed as far-fetched or unreasonable. If your client was not guilty, why did he confess? Well, Your Honor, my client confessed under circumstances, assuming, again, as we have to defer to the state's evidence about the confession, for the same reason that hundreds and hundreds, or a variant of the reason, that hundreds and hundreds of people across this country have been shown to have confessed only to have DNA emerge that shows that it was a false confession. What we understand through the gift of DNA is that when there's evidence that someone confessed, there are two tasks that the jury or trial or fact must assess. Number one, did in fact the person confess? You have police officers here who says he did. That's a credibility determination that I am not asking this court to second-guess, nor could I. But the fact that Juan Rivera, a person with a history of psychosis, a person with a history of mental illness, a person with a history of suicide attempts, a person who had been treated with psychotropic medication, but then had that taken away from him a month before the confession when he was put into custody, why do people with mental illness do things that are indicative of mental illness? I can't fully explain mental illness more than anyone else can, but what we know beyond peradventure that there are hundreds and hundreds of cases, several of them here in Illinois, in which people have confessed falsely. Now, what we do know in measuring the force of that confession, because I submit that once you have the DNA evidence in place, for that to trump, for a confession to trump the force of that DNA, it would have to be a confession of such magnitude that it erases the inevitability of reasonable doubt that the DNA creates. So what would you look at? You would look first and foremost at did the confession tell the police things that the police did not know? Now, if you look at the statements that Mr. Rivera gave, each and every time, each and every time that he goes beyond that which the police already knew, he is proven wrong or he is uncorroborated. So, for example, when he says that I walked through town that whole day, I went home, I bought some cocaine from someone, never corroborated, I walked for a mile and a half from my house, not a single witness says he saw him, they saw him. He walked back to his house after supposedly the case, not a single witness puts him there. He burned his clothes in a dumpster, no evidence whatsoever of that. He wrote about the case in his Bible as part of the confession, absolutely not. They looked in the Bible, there's nothing written. He has a tattoo on his eye in memory of his grandmother, his grandmothers are all alive, in memory of his twin brother, he never had a twin brother. All of the things that he says that the police don't already know are either completely wrong and proven such or they go uncorroborated. So we don't have the classic self-corroborating confession where a person leads the police to the body that the police didn't know. There is one piece of information, Mr. Rivera says he's at someone's party. It's later determined that party didn't exist, but he says that there's a strange man moving in and out. There is a jailhouse informant who says somebody was at a party and a strange man was moving in and out, and that strange man was determined to be Mr. Rivera. How do those tend to be similar, although certainly not the same? What do we do with that? With respect, Your Honor, I don't believe that that's exactly what the evidence shows. It's true, for sure, that Mr. Rivera comes in with a story about having been at a party at the wrong house, in which somebody was acting suspiciously and coming in and out. It's true, as well, that there's evidence that there was a party at a different house and that a different person, no one ever identifies that person as Juan Rivera. No one puts Juan Rivera at any party. No one puts Juan Rivera any place near the house except for a tentative I.D. that's been repudiated three times over by Don Engelbrecht, who doesn't say anything about a party. So the party reference is to a different person, Dion Marcadones, who had been coming in and out of a party. No one says Juan Rivera was at any party, absolutely no testimony of any sort like that. And indeed, one can speculate as to why is it that Rivera, again, as I say, a mentally ill person, comes up with this story to begin with. And as we've seen in several of the wrongful conviction cases, we saw this clearly in the Rolando Cruz case, with a fellow with history of mental illness, as well, comes up with a story based on things that may have been talked about. And in fact, there's no question that a lot of people Rivera knew were at that party, saw Marcadones come in and out. Now, we're not suggesting Marcadones is the guilty person. He's excluded by the DNA as well. And actually, there was an interesting moment prior to trial when there was debate about the admissibility of some of the Marcadones statements, ones that you wrote about, Justice Bowman, in your original concurrence in the case, when it was reversed. And the state comes in and says, and it's hard to fathom this, given the history of the case, that the state says you may not introduce the confessions or statements of Dion Marcadones. Why? Because the DNA excludes him. Well, exactly. We don't contend Dion Marcadones is the guilty party because the DNA excludes him. So how does the state get around the DNA exclusion? Exclusion that I submit to your honors in 99 out of 100 counties would have resulted in a dismissal of these charges as they have across the country. Is it your claim that the defendant was not proven guilty beyond a reasonable doubt? My claim is yes, your honor, that the doubts are reasonable ones. Didn't you ask for a remand for a new trial? We most certainly did, your honor. That was all prior to the DNA. You mean in this appeal or earlier? In this appeal. We've asked for two things in the alternative. First and foremost, we've asked the court, based on the same grounds as the Supreme Court used in People v. Smith, to recognize that the state's theories, the conjecture, the improbabilities, are simply not enough to create proof beyond a reasonable doubt. We think they go further. We think they prove actual innocence. But we're not asking the court, and that's not the court's task. But the court's task is, as in Smith, to say that the theories here, theories, for example, of plausible contamination of the DNA, that is, your honor, given this current DNA testing, a complete red herring. And let me explain why, if I may. Well, you call them unreasonable, improbable, or unsatisfactory, quoting Smith. In fact, did anyone testify that the contamination suggested by the state could have occurred? Your honor, all of the experts, including the state's experts, said they saw no evidence whatsoever of contamination, including people from the Illinois State Crime Lab that duplicated the testing that excluded Rivera. And there's a reason for that this time around. This court knows, in the first case, the DNA testing was very, very primitive. We were testing one locus. There were 21 variations. This time, we're testing 15 different loci, and there are trillions of different possibilities. So based on that, here's what we now know, and this is not debated. We know, number one, that at the time of the original autopsy, there was a swab taken, that that swab contained DNA from Holly Staker's epithelial cells, as is the case with the rape kit, and DNA of sperm, of male sperm. Point number one. Fast forward 13 years to the 2005 testing, and the material that was tested, four different items, end up containing what? They contain the DNA of Holly Staker and one male sperm. Now, if there had been contamination with some other sperm, and that sperm is typed to exclude one Rivera, something that couldn't be done before, but now we can tell the gender of the DNA you're looking at, the male sperm excludes. Now, if, in fact, there had been contamination, the experts agreed there would be two different sperm fractions there, the one that was originally on the rape kit and the one that had been the contaminant, and it would have had to happen with four independent pieces of evidence, this supposed contamination, including the vial in which the original swab with the cotton was housed. So the contamination theory is worse than just improbable conjecture and speculation. It's completely refuted by the evidence. We get then to the state's second theory. The state's second theory is, okay, well, maybe we have to concede that the DNA that was tested in 2005 was the very same DNA and sperm taken at the autopsy. But maybe it's possible that Holly Staker was having sex with somebody else within two or three days of the murder. Maybe it's possible, and therefore ignore the DNA excalpation and determine that the doubts it creates are simply not reasonable. Well, how would that fit their theory, then, that this murder was committed while aggravated sexual assault was ongoing? The evidence of the rape and sexual assault, Justice Hutchinson, comes not simply from the sperm, but from the evidence of force that was used. There was injury both to the vaginal and rectal area. So the elements of sexual assault would be there with or without that. So I don't think that's a flaw in the felony murder argument, and I can't make that argument in good faith. But what I can say is that there is absolutely no evidence, again, in a minute, to what they do present, which was grossly inadmissible. But even if you accept that inadmissible evidence, even if you say, fine, we'll consider this claim that she had been molested as an 8-year-old as somehow relevant to whether she was having consensual sex, and we'll consider the claim – may I continue? Yes. We'll consider the claim that the fact that she masturbated is indicative of the fact that she was sexually active, 11-year-old. Even if you believe that and believe that's admissible, you are left with gross conjecture about the idea that she was having sex. Evidence, again, that is not supported by any question of, well, who was she having sex with? Where did they have sex? Where did this 11-year-old girl go to have sex? When? Was there a window of time in which she wasn't with anyone? And it takes privacy and a place to have sex. Was there any evidence like that? Absolutely not a word. It was just the kind of guess and theoretical possibility that, if taken seriously, would absolutely jettison the great gift that DNA has given us to convict the guilty and exonerate the innocent. Please close. So, Your Honor, in closing, I would say that in addition to the reasonable doubt argument that we've been discussing, the evidentiary issues that are advanced, and particularly I call the Court's attention to the issues around the immiscibility of that evidence of prior sex. Under the Rape Shield Act, under relevance, and under the way that character evidence is allowed to be proven even when it is admissible, all of those reasons magnify the harmfulness of this error and tell us that even though Mr. Rivera has been convicted before, there were profound errors, several of which were new to this case, new this time around, that demand, at the very least, a new trial, but indeed demand more, demand outright reversal, if this Court, I submit with respect, is to be true to the task of meaningful review of the sufficiency of the evidence. Thank you. We'll have an opportunity to make rebuttal. Thank you, Your Honor. May it please the Court. Good morning, Counsel. Good morning, Your Honors. I am Jay Huffman of the Appellate Prosecutor's Office. Once again, it's my pleasure to represent the people of this State before this Honorable Court. I will confine myself to the reasonable doubt argument as to Defense Counsel, but of course, if Your Honors have any questions about any of the other issues, I'll do my very best to answer them. Defendant recites the mantra of DNA over and over and over again, DNA, DNA, DNA, DNA. We know that everybody has one DNA and no one shares it, just like fingerprints. That doesn't mean because a fingerprint is there, that's the person who committed the crime. It raises a question, of course. It might be more accurate to say that it's never been established that someone has someone else's DNA or that there are two people with identical DNA. Well, I accept that, Your Honor, and you're right. It could be that it could. I read a while back when I first became an attorney, a judge sitting back and saying, you know, they found out that there are snowflakes that look alike. So it might well be that this comes about. I'm sorry, Your Honors, I didn't realize. But it must be remembered here that the standard under Collins is if any reasonable juror could convict, counsel says it's not reasonable under these circumstances. Remember that not one but 36 jurors have convicted Mr. Rivera, albeit on somewhat different evidence, but it must be remembered that at the first trial, there was a defense DNA expert testifying that, yeah, look, there's DNA in here from the victim and the epithelial cells and there's other DNA and it doesn't match the defendant. Now, it subsequently turned out that that was very probably. How would a reasonable juror interpret the DNA evidence in light of the theory that there was only one perpetrator that committed this murder? The way it was argued below, Your Honor, that as unlikely as it seems, this young girl apparently had sex with someone else. And remember that there was testimony from several people, experts, about the degrading of the sperm. So it's very likely it was not from that day. The tails were missing and, as I said, although some of them said, well, I'm not sure that that's what happened here, but, yeah, it's degraded and it's very possible. And there was talk about how many days it could last. I thought they said it was possible but not likely. That's true, Your Honor. So that's a little different than what you're representing here. No, I said, well, I admit that I thought that I said they didn't say it was like, But remember, under the common standard, we're talking about whether a reasonable jury could believe that. And I believe that this case comes down to basically two things. You can say what you want about the EMS monitor on his leg. You can say what you want about the DNA. But all this comes down to one side or the other of the same coin. Either Mr. Rivera committed this crime or the police officers fed him all these factors. And I'm not talking about, of course, there were many factors that counsel points out or they didn't in their brief, were in this newspaper article. Well, couldn't he have committed the crime when they fed him the facts as well? Well, that could be, yes. But giving them the benefit of their argument, even if the police fed him all this. You meant that either he committed the crime or he didn't commit the crime and they fed him the facts which made him appear or made it appear as if he had committed the crime. Is that more precise? I guess that's better stated. Yes, Your Honor. Thank you. But if you look at the facts here and you go through the facts that were in these articles, of course, there's no evidence, and that's the difference in Milok. If you look at Milok, the defendant there testified, and the defendant testified, well, that's why I confessed. If you look at the cases I cited saying that nowhere in Illinois is there a case saying that you use hearsay like this where there's not other evidence establishing that the person in question saw it, had notice of it. And the only evidence here of that is the fact that the defendant's father testified, oh, yes, I would read these articles and discuss it with him. Of course, that's called, well, there's the obvious bias and the question that he needed an interpreter to speak at trial, and yet he said he read these articles and then discussed it with his son. Well, of course, then he had to remember all the things. And there are innumerable facts that he knew or that the police say he told them that were in those newspaper articles. But more than that, Your Honor, there are very persuasive facts that no one ever points to being anywhere. Would you refresh my recollection as to what evidence corroborates the confession? He knew that the little boy, he said that he knew the little girl. He knew the little girl was babysitting. He knew that she was babysitting a little boy and a little girl. And at one point, the little boy came out. He also spoke about her being stabbed. He knew that the knife had been thrown out in between that house and a neighbor's house. He knew there's some unclarity, but at one point he agrees with the police at the very least with regard to what clothes she was wearing. He knew the woman for whom she was babysitting. He knew the time that it happened. These are all things, and there are many more things that were in the paper, but there are many things that were not. For instance, he gives the layout of the house, and perhaps many upstairs apartments are like that, but he knows you. There's a front and back entrance. He knows you come in the front stairs, and there's the living room. Then there's the dining room. Then there's the kitchen. You have to go through all of those to get to the bathroom and to get to the bedrooms. He knew that there were two bedrooms. He knew that one had one bed. One had two beds with a dresser in between. He knew when you came up that stairs and came in that front door, and how anyone who was not in that house would know this, I don't know, that there was a couch right in front of the door, and that the television was not, as most people put their television across from the couch, but it was at the end of the couch. He knew that there was a rocking chair to the right of the couch. He knew that there was a pad on that rocking chair because he said during one of his stories, we had consensual sex. He said, we used that pad, and we put it in between the living room and the dining room. That pad is found there with the girl's panties at that place where he said that they had sex. He knew that the house was a mess, and these are all things that are not in the paper. He knew that the knife was taken from that house. He knew that the knife, when it was thrown away, was broken. He testified that he washed that knife out in the sink, and there were blood spots all over the sink. That's where it was. He knew that the back door was hit with that mop and broken. He also knew because he said that he wiped it off, and there were no fingerprints on that mop. He knew, he showed them with a pen how he put the mop in the corner. The police became aware of it, or the police went back after he had said that, and viewed the video that was taken that night, and said, look, there it is, right where he said. He also said, although it was in the paper that she was stabbed several times, he took a pen and showed how he stabbed her over like this, and how he stabbed her in the legs underneath like that. It was never said in the paper that she was stabbed below the waist. Most importantly, and I forgive anyone's sensibilities, but he told the police that she had this, he didn't use this word, but he said the beginning of pubic hair, and there was testimony from that at the autopsy. She had the seminal vestiges of pubic hair. There are too many things for him to know without either having been in that house or having the police absolutely feed all those things to him. During the course of his confessions, different officers who are members of this major crimes task force come in and start, well, and one group leaves, they say, there's another group, another couple officers want to talk to you. The other officers walk in and they say, you know, there's some inconsistencies in what you told the last two officers, so let's go over those things. This is a little unusual procedure, isn't it? Especially to say, to keep throwing in different officers, and how do officers, I can't remember all of their names because, in fact, there were so many. I do remember Officer Ostertag, or Sergeant Ostertag, because he's the one who goes, oh, there's the mob. I remember that. But there's a messer, but they're coming in and they're saying X, Y, Z, and then the next group comes in and maybe says A, B, C. The next group comes in and says E, F, G. How do we know that they're not giving information to him because there are inconsistencies? Well, there are inconsistencies in his testimony, in his stories, and that's one of the reasons that they go back and talk to him. Why doesn't the same group go back and talk to him, the same two, the same three? Well, because they're doing other things, and because not all of them. Remember, this is a multi-task force because of the violence of this crime, because they want to investigate it. And so I think that goes also to say that it's perhaps less likely that they would get together and make these things up. They have no loyalty to one another. They're from different forces. Why it was that I think it's something else. But they all didn't necessarily, I mean, we don't know this, although we know that Ostertag, I think, is the one who said, well, I didn't attend all of the staffings. Maybe the others didn't attend all of the staffings, so they don't know what the other ones know. I think that's probably true. Some knew some things, some didn't know other things, but there's no evidence that any of it was fed to him. There are some things they said they questioned. Yeah, we asked him if she had on stirrup pants and a multicolored shirt. There are some things like that. He said she had a nightgown on. At one point, yeah. There's no doubt that much of what he said is lies. She didn't have a nightgown on. No, there's no doubt. She had short shorts on. No, there's no doubt. These are apparently things, Your Honor. If you look at the progression of them, this was in his first story, and apparently comes from his belief that he's going to convince people that she seduced him and somehow he's going to be, and then he accidentally stabbed her when he didn't know he had the knife they took away from her. These are things, and there's no doubt that, as counsel said, there was nothing found in the Bible. He didn't have a twin brother. That doesn't defeat the things that he knew accurately. It doesn't defeat the progression of how this occurred. Remember how they first turned on to him, the police. He was not a suspect. He comes to someone who he knew was a suspect, who he knew had been questioned about it, in jail, and says, hey, I want to question you about this, how did it turn out? And Mr. Martin says, well, yeah, they cleared me. It's no problem. He says, well, you know, I was over there at this party, and I saw this guy. What's with this story? Why is he making this up? And we know it isn't true because there was no such party. And then he makes, that story goes on and on. First of all, well, yeah, I went over there because I heard about the party, and I waited for hours and hours and hours on the front porch but just didn't see anyone, didn't ring the doorbell, didn't knock, didn't look for anyone. These are just nonsensical things. Then he tells a story about going to the park and stealing speakers out of a car, which changes too. First he says, oh, they're still home in my basement. Then apparently he remembers, geez, they can go look for them. He says, no, you know, I sold them to somebody. That's very important in this too, his lies and the inaccuracies, because it shows that he initially approaching Martin that he was concerned about what the police knew and what the police were doing. And then he calls, and remember, he tells the police the same story that Martin says he told him. And yes, Martin makes some, for all, in everybody's belief, Martin embellishes a trial. But there's no reason to disbelieve what he says here, because he tells it to the police, and then they go see the defendant, and the defendant tells the same story. And he keeps changing it until finally, after being caught in all these lies of, oh, well, I saw this, and we saw the lights where you couldn't see the lights and things like that, he gets down to it and starts telling, okay, yeah, yeah, I was by there, and I was in the house, and this is what happened. And when the police don't accept that, which is good investigation procedure, of course, when they know things are not true, he changes again, and he changes again. And it's important to remember also that it's not only the police he tells. He tells, and we call them jailhouse snitches if you want, but they're along with Mr. Martin. And Mr. McDonald says, you know, I checked his stuff. He asked me to check it. I looked over it, and I came back to him and said, you know, this doesn't look good for you. You killed him, didn't you? And he says, yes. And later on, he breaks down crying, coming back from a religious service with Mr. Crespo. And Mr. Crespo says, he walked down and told me that he killed that girl. So it isn't just the police, and it isn't just one jailhouse snitch, if you want to call it that. It's the two we absolutely confess to, and it's Martin who really implicates him. Are there any confessions or any documents that were signed during the interrogation process where he's actually sitting up and calm and signing it? I assume I can answer the question if you can. Well, Your Honor, the testimony from the police was, yes, when they interrogated him, there was testimony that he was in this rubber room, which the jury saw, and there was testimony about his being broken down at that time, about police coming in and asking him to talk to him. But the testimony from the police was, at the time he talked to them, and at the time he signed these documents after being Mirandized, he was alert and aware. Even though he might have been on the floor when one of them had to have him sign something, in a fetal position? Well, that's one of the things he signed, but most of them he signed in between that. He was in there, and then he came out. Remember, it's back and forth that he was in the room. And he said when he was in the room talking to them that he was, although upset, because when he finds out that he may be going to jail, he talks about killing himself and stuff, but that he was not incoherent. He was aware and calm in talking to them. If there are no further questions, Your Honor, people would ask that this court affirm the conviction. Thank you. Thank you. Mr. Marshall. Thank you, Your Honor. Quote, as unlikely as it seems, the girl may have been having sex. As unlikely as it seems, given the absence of evidence, that's what the state's case rests on. The state says, well, there was an expert who said that it was possible that the erosion of some of the tests and the tails could have something to do with the duration. But the expert said that was very unlikely. He had never seen anything like it. The other experts completely refuted it. Let's assume the jury credited the expert who said it was remotely possible but unlikely. Does that possibly mean that the doubts that linger about Juan Rivera's guilt are unreasonable? Does it mean that a jury can look at that and say, well, yes, you know, the DNA is out there and we know how powerful DNA has been, but it's unreasonable to doubt that Juan Rivera committed this crime. Well, Mr. Hoffman says the only way you could have gotten there is A, believing she had other sex. I hear that to completely abandon the contamination theory, which is critical. Because when he says at the first trial the jury convicted, as this court explained in its opinion, that's because there was actually evidence of possible contamination or speculation of contamination at that first trial. But that was completely blown out of the water with the subsequent DNA testing. So we get then to the idea of what do you do when you have a compelling DNA exclusion that can only be saved by evidence-less speculation? And, well, it's always humanly possible even though we have no evidence. But yet, as the prosecution says, there is a confession. What do you do? Do you say that, well, it's for the jury simply to decide in the absence of any expert testimony, mind you, around how the mental illness could have affected things? And I just want to say that when you read our brief, you will see we cite many, many cases, and Becker doesn't question this, that when mental illness is involved, there is a right to have an expert explain how that's going to manifest. The court said that in first appeal, relied on the fact that the jury heard that. So the jury's ability to assess and balance was skewed by those problems, skewed by the polygraph, skewed by the inadmissible evidence under rape shield and down the line. But going back for a moment to the reasonable doubt, I want to throw four numbers at you, Your Honors. 54, 25, 15, and 13. Fifty-four is the number of facts in the statement that Mr. Rivera gives, the statement. Twenty-five of those 54 are the ones that actually end up being true. Fifteen of them end up being demonstrably false. Thirteen of them end up being such that one would think clearly they ought to be verifiable if true, and yet they're not verified. And I'm not talking about stuff that no one else could know, like what Hawley said or didn't say. Those don't go into the mix. I'm talking about facts that either were proven false or could be. There are more of those than the true ones. And Mr. Hoffman says, well, you know, he's giving all these bizarre statements about the party, and then he's changing his story, and then he says, well, I never told you any of this. Is that evidence that overcomes the DNA, or is it evidence that shows you have a deranged person here, a mentally ill person? As the U.S. Supreme Court said in Atkins, we know there is a grave risk, particularly among the mentally ill, of false confessions. And we also know that the police concede that they asked many leading questions. Now, the 54 facts that you just identified, are some of those the ones that Mr. Hoffman just related to us here? Some of them are, Your Honor. And there's no question that particularly around some of the layout of the house, some of those, many of those are accurate, not all of them. But some of the key issues, for example, the description of the stabbing. He says, I stabbed her at least twice. Is that the confession of someone who stabbed someone 27 times? Did he show, is there evidence that he showed them how she was stabbed twice? Yes, but not in a way that was indicative or corroborated in dramatic fashion by the forensic evidence. To the contrary, the forensic evidence says she was also strangled. Completely absent, completely absent from the statement. The police admit that when they didn't like an answer, they sought correction. They didn't like his answer of what she was wearing, so they asked him in a leading question, are you sure she was wearing that? Or could she have been wearing, quote, black stirrup pants and a multicolored shirt? Phrases that the police agree are their own phrases. And you go over and over, are you sure you didn't see a pizza on the couch, they ask him. When we look at his description of the door and the blue mop, he says in the statement, I just ran out of the house, I didn't do anything. They then come back and all of a sudden he gives a different statement. I'm not accusing the police of lying here, but if the state's claim is that what overcomes the DNA is the fact that there were these, quote, secret, end quote, facts, many of which were in the newspapers, by the way, and in the public domain, but if the state's claiming that's what overcomes, then the state had the burden of establishing the secrecy of those facts. And what was established was there were leading questions asked all the time, and for seven of the ten witnesses who interrogated him, they never ever even say that they didn't disclose facts. The state never says, well, in the questioning, did you reveal anything? Did you describe things to him the way that you would imagine over 26 hours of testimony would happen? And, of course, we also know that Mr. Rivera didn't write any of these statements. These are summaries written by the police. Did he write the first one? He wrote the first one that's completely incoherent, but no one's relying on that. That's the one that sort of demonstrates how absolutely astonishingly different the subsequent statements are, and although, again, I don't ask the court to second-guess credibility per se, I do want to suggest that it's not a binary question, and that is if you're relying on the confession, it shouldn't either be, well, did the confession happen or didn't it? Again, let's assume it happened. But you have to look at the circumstances of it. It is absolutely astonishing that every person in the jail, every medical professional, said Mr. Rivera was psychotic. He was tearing out not just his hair, but his scalp, tufts of hair. He was tactile responsive. He was in a fetal position. He was scary to approach. That's the person from whom these confessions was extracted. A confession taken under those circumstances, so rife with falsehood, so refuted in every fact beyond what the police knows, simply cannot be enough to overcome the force of DNA, God's greatest gift ever to forensic science. With that, Your Honors, and with the request that, although we have focused on reasonable doubt, we beg the court not to assume that that means anything about the force of those other arguments. To the contrary, I think those arguments speak loudly and clearly from the briefs. And we ask, therefore, that the court, preferably, we believe, compelled by law, reverses the conviction, recognizes that facts like this, pictures of a dead 11-year-old girl, can blind juries. And that's why you, Sid, in sober review, this isn't a fool's exercise. This is a meaningful assessment of the evidence. And I submit that no case in Illinois has ever upheld a conviction with a DNA exoneration of this sort. And this court ought not be the first. Thank you. The case will be taken under advisement.